## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF SOUTH DAKOTA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| ALEXANDER LEVENE<br>and DAVID HUSMAN, | §<br>§<br>§ | |
| Plaintiffs, | § | CASE NO. 20:4171-KES |
| | § | |
| V. | §<br>§ | Judge Karen E. Schreier |
| STAPLES OIL CO., INC., and<br>ALBERTUS SCHELHAAS, | §<br>§<br>§ | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

The Court should deny Defendants' Motion for Partial Summary Judgment [Doc. No. 30] because Defendant Staples Oil Co. Inc. ("Staples Oil") knew, or should have known, of the risks inherent in failing to train and supervise Defendant Albertus Schelhaas ("Schelhaas") to safely operate a commercial motor vehicle in hazardous weather conditions, and negligently failed to do so and remediate the risks to the motoring public. Plaintiffs respectfully show the following in response to Defendants' Motion for Partial Summary Judgment and Brief:

### SUMMARY OF ARGUMENT

This case arises from a motor carrier not ensuring that a driver was properly trained to drive in hazardous weather conditions which resulted in a rear-end collision on December 27, 2018 on Interstate I-90 in Minnehaha County, South Dakota. Defendants admit that "[a]t the time of the wreck[,] the road was icy and there was freezing rain, sleet, and/or hail." *See* Doc. No. 1 at ¶ 25; Doc. No. 9 at ¶ 20 ("admit[ting] the allegations in Paragraph 25 of Plaintiffs' Complaint.").

Plaintiffs no longer intend to pursue their claims of negligent hiring, entrustment,

1

maintenance and retention, leaving claims for negligent training and supervision.  *See* Doc. No. 31 [Defendants' Brief] at 8-11.

Although Defendant Staples Oil provided one-hour of hazardous materials training to Defendant Schelhaas and had him watch a video on how to avoid a rollover on the same day he submitted his employment application, it is beyond dispute that it did not provide any instruction on how to safely operate a commercial motor vehicle, including when and how to operate in hazardous weather conditions, maintaining a proper lookout, and maintaining a safe speed for the conditions.  This systemic failure led to Defendant Schelhaas operating a 78,000 pound tractor-trailer, fully loaded with flammable ethanol, at speeds of 57 miles per hour on a known icy highway moments before the crash when the Federal Motor Carrier Safety Regulations ("FMCSR") and Commercial Driver's Manual ("CDM") required him to slow his speed and operate at a "crawl," if not cease operations altogether.

Furthermore, Defendant Staples Oil actively monitored weather and road conditions, regularly communicated with its drivers, and had electronic systems in place to monitor the location and speed of its small fleet of tractor-trailers.  On the date of the crash, Defendant Staples Oil delayed Defendant Schelhaas' start time due to pre-existing weather and knew that hazardous winter weather was incoming.  Instead of shutting down operations for the day, consistent with their professed policy and procedure (as no formal policies existed), they chose to place Defendant Schelhaas in the storm with no training on the relevant FMCSR and CDM provisions.

The collective acts and omissions of Defendants Staples Oil and Schelhaas were not only negligent, they were willful, wanton, and in extreme disregard for the rights and safety of the motoring public, which included Plaintiffs on December 27, 2018.

Finally, sections 383.1, 383.10, 383.111, 383.113, 390.11, 392.1, 392.2 and 392.14 of the FMCSR are safety regulations that set forth a heightened duty and standard of care for motor

2

carriers and truck drivers, the blatant violation of which constitutes negligence *per se* under South Dakota law.

## MATERIAL FACTS

In support of their response in opposition to Defendants' Motion for Partial Summary Judgment, Plaintiffs incorporate herein by reference their contemporaneous filed Statement of Material Facts ("SMF"). The SMF highlight five areas that are relevant to the argument, including:

- Defendant Staples Oil Conducted a Rushed Hiring and Orientation Process and Failed to Adequately Train Defendant Schelhaas;

- Defendant Staples Oil Failed to Follow and Enforce its Own Policies and Procedures by Not Discharging Defendant Schelhaas When he Backed Into a Legally Parked Vehicle During His Initial Appraisal Period;

- The Federal Motor Carrier Safety Regulations ("FMCSR") and Minnesota Commercial Driver's Manual ("CDM") Govern the Safe Operation of a Tractor-Trailer in Hazardous Weather Conditions;

- Monitoring the Weather and Road Conditions at Defendant Staples Oil Was Everyone's Responsibility; and

- Defendant Staples Oil Assigned a Load to Defendant Schelhaas Knowing it Would Require Him to Drive in Hazardous Weather Conditions in Violation of the FMCSR and CDM.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out "specific facts showing that there is a genuine issue for trial." *Id.* at 324. "Summary

3

judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[A]t the summary judgment stage, the trial judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The facts, and inferences drawn from those facts, are "viewed in the light most favorable to the party opposing the motion" for summary judgment. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted); *see also Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) ("[F]acts must be viewed in the light most favorable to the nonmoving party…if there is a genuine dispute as to those facts."). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *See Torgerson*, 643 F.3d at 1042 (citations omitted).

## APPLICATION OF LAW TO FACTS

Viewed in the light most favorable to the Plaintiffs, the facts, and all reasonable inferences drawn from those facts, establish that Defendants Staples Oil violated duties it owed to the public in failing to properly train and adequately supervise Defendant Schelhaas.[1]

---

[1] Defendants did not address negligent supervision in their briefing. Ordinarily, Plaintiffs would argue waiver of this issue; however, the Complaint did not label Count One to include "supervision," notwithstanding the fact that the Complaint alleged:

> "Defendant SOC failed to set a safety procedure to ensure Defendant Schelhaas complied with the dictates of the FMCSA"; and

> "Defendant SOC had a duty to promulgate and enforce rules and regulations to ensure its drivers and vehicles were reasonably safe, and negligently failed to do so."

*See* Doc. No. 1 at ¶¶ 45-46.

## I.      Summary Judgment in Negligence Actions is Reserved for the Rarest of Cases.

Generally, there are three requirements in a negligence claim: "(1) a duty on the part of the defendant; (2) a failure to perform that duty; and (3) an injury to the plaintiff resulting from such a failure." *See Kirlin v. Halverson*, 758 N.W.2d 436, 448 (S.D. 2008). "Absent legislative preemption, courts decide the existence of a legal duty because it is entirely a question of law, to be determined by reference to the body of statutes, rules, principles and precedents which make up the law." *See McGuire v. Curry*, 766 N.W.2d 501, 505 (S.D. 2009). "While negligence actions are not generally suitable for summary judgment, it is appropriate when the duty question is resolved in favor of the defendant." *See Kirlin*, 758 N.W.2d at 448; *see also Iverson v. NPC Intern., Inc.*, 801 N.W.2d 275, 278 (S.D. 2011) ("If a duty exists, the remaining questions of breach and causation are factual questions that must be determined by the trier of fact."); *Nelson v. Nelson Cattle Co.*, 513 N.W.2d 900, 903 (S.D. 1994) ("Ordinarily, questions of negligence are for the jury in all but the rarest cases...so long as there is evidence to support the issues."); *McGuire*, 766 N.W.2d at 505 ("Summary judgment is usually inappropriate in a negligence case, except when no duty exists as a matter of law.").

## II.     The Federal Motor Carrier Safety Regulations Exist to Protect the Public From Motor Carriers and Truck Drivers Driving in Hazardous Weather.

Due to their size, weight and complexity to operate, "[m]otor carriers and [truck drivers] are required to know and obey a much broader and more stringent series of state and federal regulations than those who operate non-commercial motor vehicles." *See* Doc. No. 34-9 [Adam Grill Expert Report] at 9. The FMCSR set a uniform national standard for all motor carriers, truck drivers, and tractor-trailers traveling interstate, and provides, in relevant part:

> "Every commercial motor vehicle must be operated in accordance with the laws, ordinances, and regulations of the jurisdiction in which it is being operated. **However, if a FMCSA regulation imposes a higher standard of care than that law, ordinance or regulation, the regulation must be complied with.**"

*See* 49 C.F.R. § 392.2 (emphasis added).

South Dakota adopted all of the relevant provisions of the FMCSR at issue in this action. *See* SDCL § 49-28A-3; *see also Kukla v. Hulm*, 310 F.3d 1046, 1049 (8th Cir. 2002) ("South Dakota has adopted federal regulations regarding motor carriers."). Defendants Staples Oil and Schelhaas acknowledge that the FMCSR represent the <u>minimum</u> industry standards for trucking:

> 22   Q   And the Federal Motor Carrier Safety Regulations, they
> 23       are the minimum industry standards for trucking; is that
> 24       true?
> 25   A   They are the minimum, correct.

*See* Doc. No. 34-7 at 19 (74:22-25); *see also* Doc. No. 34-4 at 7 (26:21-27:4).

Of particular relevance to this action is Part 392 of the FMCSR which governs the driving of commercial motor vehicles. Section 392.1 provides, in relevant part, that "[e]very motor carrier, its officers, agents, representatives, and employees responsible for the…operation, and driving of commercial motor vehicles, or the hiring, supervising, training, assigning, or dispatching of drivers, **shall be instructed in and comply with the rules in this part**." *See* 49 C.F.R. § 392.1(a). This Part contains a provision that imposes a higher standard of care on motor carriers and truck drivers requiring that the employ "extreme caution" in "hazardous weather conditions":

> **§392.14 Hazardous conditions; extreme caution.**
> Extreme caution in the operation of a commercial motor vehicle shall be exercised when hazardous conditions, such as those caused by snow, ice, sleet, fog, mist, rain, dust, or smoke, adversely affect visibility or traction. Speed shall be reduced when such conditions exist. If conditions become sufficiently dangerous, the operation of the commercial motor vehicle shall be discontinued and shall not be resumed until the commercial motor vehicle can be safely operated. Whenever compliance with the foregoing provisions of this rule increases hazard to passengers, the commercial motor vehicle may be operated to the nearest point at which the safety of passengers is assured.
> [33 FR 19732, Dec. 25, 1968, as amended at 60 FR 38747, July 28, 1995]

*See* 49 C.F.R. § 392.14.

Defendant Schelhaas acknowledged he was required to comply with this provision. *See*

Doc. No. 34-4 at 10 (38:10-40:17).  Defendant Schelhaas further acknowledged that the Minnesota CDM – which is "substantively uniform to those published by all other states [including South Dakota] – contains the required knowledge and skills that a truck driver must follow to safely operate a commercial motor vehicle.  *Id.* (27:10-28:8); *see also* Doc. No. 34-9 at 10-11.  Directly pertinent to the resolution of this case is Section 2.6.2 of the CDL which requires a truck driver to reduce his speed by one-third on a wet road; one-half on a snow-packed road; and, **reduce his speed to a crawl and stop driving as soon as he could safely do so if the surface is icy**:

> ### 2.6.2 – Matching Speed to the Road Surface
>
> You can't steer or brake a vehicle unless you have traction. Traction is friction between the tires and the road. There are some road conditions that reduce traction and call for lower speeds.
>
> **Slippery Surfaces.** It will take longer to stop, and it will be harder to turn without skidding, when the road is slippery. Wet roads can double stopping distance. You must drive slower to be able to stop in the same distance as on a dry road.
>
> Reduce speed by about one-third (e.g., slow from 55 to about 35 mph) on a wet road. On packed snow, reduce speed by a half, or more. If the surface is icy, reduce speed to a crawl and stop driving as soon as you can safely do so.

*Id.* at 12-13 (48:10-49:15); *see also* Exhibit 35-2 at 4-5 (emphasis added).

Indeed, as noted by Mr. Grill, "the role[] of persons who hire, manage, supervise, train, and retain drivers…are paramount to highway safety."  *See* Doc. No. 34-9 at 13.  "Moments before the crash is not the time…to discover that a driver…lacks the necessary experience and/or training to operate a CMV safely."  *Id.*  "The important role of motor carrier management, and strict compliance to motor carrier rules, regulations, customs, and practices related to the safe operation of CMVs, cannot be overstated."  *Id.*

### III.   Defendant Staples Oil Failed to Properly Train Defendant Schelhaas to Exercise Extreme Caution in Hazardous Weather Conditions.

"[A]n employer may be held liable for negligent hiring, retention, training and

7

supervision." *See Kirlin*, 758 N.W.2d at 448 (citing *Rehm v. Lenz*, 547 N.W.2d 560, 566 (S.D. 1996)).   "A negligent training claim suggests that the **manner or circumstances of the employee's training** by the employer **inadequately** or defectively *coached*, *educated*, or *prepared* its employee[] for the performance of [his] job duties." *Id.* at 452 (emphasis added).

Defendants contend "…there is no dispute that Staples provided Schelhaas with orientation and training when he was hired." *See* Doc. No. 31 at 12.  This is a grossly misleading statement that is parroted repeatedly in Defendants' brief.  The documentation produced by Defendant Staples Oil confirms it performed a hurried hiring and orientation process <u>on the very same date that Defendant Schelhaas submitted his application</u> before Defendant Staples Oil knew anything about his background, fitness and qualification to operate a tractor-trailer.  *See generally* SMF at ¶¶ 1-36.

Defendant Schelhaas applied to be a truck driver with Defendant Staples Oil on July 16, 2018.  *See* Exhibit 35-1 at 11-12.  Defendant Staples Oil hired him on-the-spot as evidenced by the employment-related documentation.  *Id.* at 4-8.  The extent of Defendant Schelhaas' training during his same-day orientation consisted of one-hour of hazardous materials training – which had nothing to do with how to operate a tractor-trailer – as well as a vehicle roll over training video, the latter representing the only training video on how to safely operate a tractor-trailer:

| | | |
|---|---|---|
| 11 | Q | Okay.  Besides the rollover video. are there other videos |
| 12 | | that Staples Oil Company shows its drivers that deal with |
| 13 | | how to drive the truck? |
| 14 | A | There is not. |

*See* Doc. No. 34-7 at 11 (44:20-24); 12 (45:8-14); *see also* Doc. No. 35-1 at 20-21.

Defendants maintain that Defendant Schelhaas' road test was part of his training.  *See* Doc. No. 31 at 13.  The road test was part of Defendant Schelhaas' qualification process; it was not training.  *See* 49 C.F.R. § 391.11(8).  Moreover, the road test which Defendants contend comprised part of his training **<u>consisted of only 2.4 miles of driving in July</u>**, yet astonishingly covered thirty-

seven (37) areas of operation. *See* Doc. No. 35-1 at 17. Despite the form requiring the examiner to evaluate Defendant Schelhaas in each of the discrete areas – "Excellent, Good, Fair, Poor" – there were only checkmarks and a box marked "PASSED." *Id.* It is difficult to conceive Defendant Schelhaas being deemed sufficiently proficient in each of the areas in this negligible distance, let alone receiving any training in the minutes it presumably took to drive it. Indeed, within 90-days of Defendant Staples Oil deeming him proficient in backing a tractor trailer, Defendant Schelhaas backed into a legally parked vehicle. *Id.* at 1, 17. This demonstrated a marked deficiency; however, Defendant Staples Oil failed to provide any additional training other than a conversation about the incident. *See generally* SMF at ¶¶ 37-54; Doc. No. 34-4 at 5 (18:19-19:5); *see also* Doc. No. 34-7 at 27 (106:18-107:13).

Further, it is entirely unclear what, if any, safety-related training the ride-along(s) provided, assuming they even occurred. Defendant Schelhaas was hired on July 16, 2018, and started driving a route for Defendant Staples Oil on July 23, 2018 – his available "start date" as noted in his application. *See* Doc. No. 35-1 at 11-12, 31. Defendant Staples Oil produced no written materials documenting that Defendant Schelhaas participated in, and completed, two to three weeks of ride-along(s) with other drivers. *See* Doc. No. 34-7 at 12 (47:14-19). If this indeed occurred, and was comprehensive and provided any degree of safety-related training, Defendant Staples Oil would have produced this information in discovery. Moreover, there was no checklist of skills that the drivers were required to observe and ensure Defendant Schelhaas could perform proficiently. *Id.* (47:4-7). As it stands, the testimony concerning ride-along(s) confirm they were nothing more than an informal process not governed by any standardized policy or procedure:

```
 3   Q   Okay.  So let's talk about the training process then.  Is
 4       there a written training process for the drivers that are
 5       watching these guys or gals who are new hires, what to
 6       look for?
 7   A   There is not.
 8   Q   All right.  Is there any training materials for the —
 9       I'm going to call it this way.  Is there any training
10       materials that train the trainers?  Do you understand
11       what I'm saying?
12   A   I do, yeah, and we don't have any materials for that.
```

*Id.* at 12 (46:3-12).

Defendants' reliance on the employee handbook is similarly misplaced. *See* Doc. No. 31 at 12. Although the 17-page employee handbook contains a safety policy that generally purports to encourage safe practices, the handbook is predominantly, if not exclusively, focused on personnel-related issues and completely devoid of any safety-relating training. *See* Doc. No. 35-1 at 33-49. Defendant Staples Oil did not have a safety handbook and did not maintain a safety budget. *See* Doc. No. 34-7 at 31 (122:20-24). It did not have in place "a safety training or refresher module that require[d] drivers to watch videos or view materials at a set time throughout the year." *Id.* at 12 (45:18-22). It did not "push" safety-related information or reminders out to drivers. *Id.* at 31 (122:25-123:6). Safety meetings were held only once every three years to comply with hazmat requirements. *Id.* (123:7-10). This was the extent of the training provided to Defendant Schelhaas. *See* Doc. No. 34-7 at 20 (77:21-78:19).

In violation of its 49 C.F.R. § 392.1 obligation to train and instruct its truck drivers, Defendant Staples Oil failed to provide any training on driving in hazardous weather conditions:

```
20   Q   Has Staples ever showed any type of video or provide any
21       type of training on driving in inclement weather?
22   A   No.  Our newer trucks have some videos that the guys that
23       have the new automatic transmissions in watch videos
24       because they handle differently than a manual
25       transmission.
```

```
1   Q   But nothing – the drivers don't watch any videos or have
2       any training about inclement weather?
3   A   No.  We generally shut down if the weather is bad and
4       wait until it's better before we go again.
5   Q   Okay.  So no – and I know this is kind of redundant.
6       I'm not trying to beat a dead horse; I'm just trying to
7       make sure.  No training or videos on how to drive in fog?
8   A   No.  We don't go out if it's foggy.
9   Q   Okay.  No videos or training on how to drive in heavy
10      rain?
11  A   No.
12  Q   No training or videos on how to drive in snow or ice?
13  A   No.
14  Q   No video or training on how to recognize that there may
15      be ice on the road if the driver is out and weather
16      starts to come in?
17  A   No.  We live in it where they have done it since they got
18      a driver's license at 16 years old.
19  Q   And does Staples have any written policy or procedure on
20      speed that a driver must drive in domestic conditions,
21      whether it's snow, ice, rain, fog?
22  A   No written policies since the day of the conversation of
23      drive safe, slow down, let me know if the weather is
24      getting bad.  You know, we'll cut it short and we'll go
25      home.  I mean we do that every time there is weather.
```

*See* Doc. No. 34-7 at 27-28 (108:20-109:25).  Contrary its deposition testimony, which depicted a responsible cessation of operations in hazardous weather as the reason it does not provide hazardous weather training to its truck drivers, Defendant Staples Oil failed to "shut down" and "wait [out]" the hazardous weather conditions in this case.

When viewed in the light most favorable to Plaintiffs, a jury could reasonably conclude that Defendants breached their duty to the public when Defendant Schelhaas, in the absence of any training, operated the tractor-trailer at a speed of 57 mph on an icy roadway moments before the crash. *See* Doc. No. 34-4 at 14 (53:17-54:14); *see also* Doc. No. 35-1 at 26.  Defendant Schelhaas knew the roadway was icy, and failed to slow his speed as required by the FMCSR and CDM:

```
                                                              51
:d 10/24/22   Page 13 of 25 PageID #: 801
1   Q   Was the surfaces icy on December 27, 2018?
2   A   Yes.
3   Q   Did you slow your speed to a crawl?
4   A   No.
```

*Id.* at 13 (50:16-51:4).  This was a gross deviation from the standard of care owed to the public.

Even when confronted with Defendant Schelhaas' recklessness that preceded the crash, Defendant Staples Oil totally missed the mark.  As documented in his *Second Letter of Warning*, Defendant Staples Oil counseled Defendant Schelhaas regarding the importance of "maintaining a safe following distance" when the real issue that directly and proximately caused the collision was his unchecked operation in hazardous weather conditions and reckless rate of speed;

Supervisor Comments:
On 12/27/2018 Al was involved an accident on Westbound I-90 just before the Brandon, SD exit.  Weather was poor with rain/snow mix and the roads were sloppy.  A pick up truck traveling in front of Al came to a stop has he approached a snow plow and Al was not able to stop in time and hit the pick up truck in the rear.  Al was cited for driving too fast in the road conditions.

Al and I discussed the importance of maintain a safe following distance as dictated by the road conditions.

I have discussed the situation described above with my direct supervisor and am fully aware of Staples Oil Company's Policy concerning this issue.  I understand that I am free to return to work at this time.  I also understand that if I continue to violate this policy that I will be dismissed at that time

_____                              _____
Direct Supervisor of Employee                Employee Signature

*See* Doc. No. 35-1 at 2.  Again, Defendant Staples Oil did not require Defendant Schelhaas to perform any remedial training as a result of this collision.  *See* Doc. No. 34-7 at 27 (108:5-19). Moreover, in violation of policy, Defendant Staples Oil failed to perform a preventability analysis. *Id.* at 13 (49:25-50:2); Doc. No. 34-9 at 28-30 (discussing preventability analysis); *see also* Doc. No. 35-1 at 5 (policy).  In fact, Defendant Staples Oil mistakenly (or falsely) testified that no policy required that a preventability analysis be completed.  *Id.* (50:3-9) (50:24-51:1).

Defendants finally expend considerable energy focusing on Mr. Grill's report, inviting the Court to view his opinions and conclusions in a vacuum.  *See* Doc. No. 31 at 13-16.  Mr. Grill's report was exhaustive and explained that Defendant Staples Oil was under a regulatory responsibility to ensure that Defendant Schelhaas met his FMCSR obligations, citing to several key provisions for authority.  *See* Doc. No. 34-9 at 13-14.  To obtain operating authority, Defendant Staples Oil was required to certify, among other things, that it had in place an individual responsible for ensuring compliance with the FMCSR and a "safety training/orientation program"

in place. *Id.* at 14-15. "This means that Staples Oil [was] the one responsible for ensuring proper compliance with the [FCMSR]; including having a program in place for effectively training their drivers." *Id.* at 16. Based on his review of the record, he opined "Staples Oil failed to ensure that these requirements were effectively met, given that the nature of Defendant Schelhaas' driving could have been prevented through proper monitoring, **training**, and supervision as indicated throughout [his] report." *Id.* (emphasis added). He explained that a company must employ a three-phase approach to training, including (1) education; (2) practical experience; and (3) assessment. *Id.* at 17-19. As illustrated above, Defendant Staples Oil was deficient in each respective area. Defendant Staples Oil's failures must be viewed in conjunction with Defendant Schelhaas' failures that directly caused the crash. *Id.* at 21-28. Notably, Mr. Grill's opinions specifically considered the blatant violations of CDM 2.6.2 and 49 C.F.R. § 392.14. *Id.* at 24-27.

### IV.   Defendant Staples Oil Failed to Properly Supervise Defendant Schelhaas.

"[A] negligent supervision claim alleges that the employer inadequately or defectively managed, directed or oversaw its employee[]." *Id.* "A claim of negligent supervision avers that the employer failed to exercise reasonable care in supervising (managing, directing, or overseeing) its employee[] so as to prevent harm to other employees or third persons." *See Iverson*, 801 N.W.2d at 282 (citation omitted). "The duty involved…is one of ordinary care." *Id.* at 283. "[T]he existence of the duty of ordinary care depends on the foreseeability of the injury." *Id.*

Not only did Defendant Staples Oil fail to train Defendant Schelhaas, and fail to promulgate and enforce rules and regulations to ensure he was reasonably safe, it set him into motion the morning of the crash, knowing he would encounter hazardous weather conditions in the absence of such training. *See generally* SMF at ¶¶ 71-108. Monitoring the weather at Defendant Staples Oil was everyone's responsibility, and there was an open line of communication with its truck drivers. *See* Doc. No. 34-7 at 17 (67:7-11); 14 (54:4) ("[W]e're talking to them all day."); 15

(57:18-19) ("We talk to them all day long...."). Defendants discussed the existence of inclement weather the morning of the crash. *See* Doc. No. 34-4 at 18 (70:2-6). Indeed, Defendant Schelhaas' start time was delayed due to the "previous [inclement] weather." *Id.* (70:7-9). Defendant Staples Oil also "...knew there was weather coming." *See* Doc. No. 34-7 at 19 (75:18-19). Despite the existence of "previous weather" and "[knowing] there was weather coming," Defendant Staples Oil chose to thread the needle by assigning a load of 7,800 gallons of ethanol to Defendant Schelhaas at 10:16 a.m. *See* Doc. No. 35-1 at 3, 27-29; *see also* Doc. No. 34-7 at 22 (85:19-23). But for Defendant Staples Oil assigning the load to Defendant Schelhaas in the face of hazardous weather conditions and its own professed corporate policy, this collision would not have occurred.

In their Statement of Material Facts, Defendants contend that Defendant Schelhaas "picked up his load in Luverne, Minnesota at 10:16 a.m." in an attempt to broaden his driving window. *See* Doc. No. 32 at ¶ 41. This is an incorrect statement. At 10:29 a.m., Defendant Schelhaas drove a distance of approximately 23 miles in 32 minutes from his residence to the Agri-Energy terminal in Luverne, Minnesota. *See* Doc. No. 35-1 at 3, 22. Agri-Energy loaded 7,802 gross gallons of ethanol into the tanker truck between 12:01 p.m. and 12:31 p.m. *Id.* at 3. Defendant Schelhaas actually started his trip from Luverne, Minnesota to Sioux Falls, South Dakota at 12:32 p.m., more than two hours after Defendant Staples Oil first assigned the load to him. *Id.*

Even assuming that the weather momentarily improved, which Plaintiffs dispute, there is no question that the conditions deteriorated significantly by the time Defendant Schelhaas departed Luverne, Minnesota.[2] At about the same time Defendant Schelhaas was preparing to depart the Agri-Energy terminal, Plaintiffs were preparing to end work for the day at a rest area on the South Dakota / Minnesota border due to the weather conditions. *See* Doc. No. 34-1 at 65:2-19; 34-2 at

---

[2] The weather remained poor all day, as further evidenced by Quest Diagnostics, the clinic designated to administer the post-crash drug test to Defendant Schelhaas, closing early at 4:00 p.m. *See* Doc. No. 35-1 at 18.

48:23 ("It was getting bad enough that we – they called it, so we were going to head in before it got too bad."). Defendant Staples Oil monitored 511 South Dakota so they knew, or should have known, of the hazardous weather and road conditions. *See* Doc. No. 34-7 at 17 (66:25). It communicated regularly with its drivers. *Id.* at 14 (54:2-4); 15 (57:18-19). Despite the window to monitor and discuss the impending hazardous weather conditions with Defendant Schelhaas – he was "on duty" from 11:01 a.m. to 12:32 p.m. at the Agri-Energy terminal – Defendant Staples Oil did not delay or suspend his trip contrary to its stated policy and procedure. *See* Doc. No. 35-1 at 22; *see also* Doc. No. 34-7 at 28 (109:1-4).

Defendants admit that, at the time of the wreck, <u>approximately thirty-six (36) minutes after Defendant Schelhaas departed the Agri-Energy terminal</u>, "the road was icy and there was freezing rain, sleet, and/or hail." *See* Doc. No. 1 at ¶ 25; Doc. No. 9 at ¶ 20; *see also* Doc. No. 35-1 at 22 (change of status from "driving" to "on-duty" at 1:08 p.m.). If there was any doubt about the timing, a screenshot from the South Dakota Highway Patrol cruiser captures the moment the officer arrived at 1:10 p.m.:



*See* Doc. No. 35-1 at 50. In that very short trip, Defendant Schelhaas observed icing on the roadway. *See* Doc. No. 34-4 at 11 (43:1-6); 12 (46:25-47:3). He could have safely exited the

highway at multiple points, but failed to do so. *Id.* at 14 (56:7-20).

Knowing it was sending Defendant Schelhaas out in hazardous weather conditions, Defendant Staples Oil failed to provide clear, explicit and unequivocal instruction to Defendant Schelhaas to properly slow his speed and cease operations if conditions deteriorated. Barring the systemic failure in the first instance, Defendant Staples Oil also failed to use the Pedigree Technologies OneView technology reasonably available to it to monitor Defendant Schelhaas' progress and speed. *See* Doc. No. 34-7 at 17 (65:23-66:7); *see also* Doc. No. 35-1 at 25-26. It is inexcusable that Defendant Schelhaas operated a 78,000 pound tanker truck filled with flammable ethanol at speeds of upwards of 57 mph on an icy roadway. The collective negligence of Defendants invited this collision. Unquestionably, a crash resulting in personal injury was a foreseeable consequence of (1) operating a tractor-trailer in hazardous weather conditions; and (2) operating the tractor-trailer at grossly excessive speeds for the conditions. A reasonable jury could similarly return a verdict in favor of Plaintiffs on the negligent supervision claim; therefore, summary judgment is likewise improper on this count.

### V.    Operating a Tractor-Trailer at Grossly Excessive Speeds on an Icy Roadway is Willful and Wanton Conduct that Demonstrates a Conscious Disregard for the Rights and Safety of Other Motorists on the Roadway.

Punitive damages in tort actions are authorized by South Dakota law. *See* SDCL § 21-3-2. In relevant part, Plaintiffs must demonstrate that Defendants acted with malice, either actual or presumed. *Id.*; *see also Holmes v. Wegman Oil Co.*, 492 N.W.2d 107, 112-13 (S.D. 1992). Presumed legal malice is defined as:

> "[M]alice which the law infers from or imputes to certain acts. Thus, while the person may not act out of hatred or ill-will, malice may nevertheless be imputed if the person acts willfully or wantonly to the injury of the other."

*See Selle v. Tozser*, 786 N.W.2d 748, 757 (S.D. 2010). The South Dakota Supreme Court has described willful and wanton conduct as follows:

"Willful and wanton misconduct means something more than negligence. It describes conduct which transcends negligence and is different in kind and characteristics.  It is conduct which partakes to some appreciable extent, though not entirely, of the nature of a deliberate and intentional wrong.  **There must be facts that would show that defendant intentionally did something in the operation of the motor vehicle which he should not have done or intentionally failed to do something which he should have done under the circumstances that it can be said that his conduct would in all probability, as distinguished from possibility, produce the precise result which it did produce and would bring harm to plaintiff.** Willful and wanton misconduct demonstrates an affirmative, reckless state of mind or deliberate recklessness on the part of the defendant.  Such state of mind is determined by an objective standard rather than the subjective state of mind of the defendant."[3]

*See Tranby v. Brodock*, 348 N.W.2d 458, 461 (S.D. 1984) (citation omitted) (emphasis added).

"A claim for presumed malice may [also] be shown by demonstrating a disregard for the rights of others." *See Isaac v. State Farm Mut. Auto. Ins. Co.*, 522 N.W.2d 752, 761 (S.D. 1994).

While continuing to deny any negligence in a footnote, Defendants describe the collision as follows:

> This case involves a rear-end motor vehicle accident that occurred during a winter weather event. Schelhaas unexpectedly encountered stopped traffic after reaching the top of a blind hill and was unable to stop in time to avoid the accident as he approached Plaintiffs' vehicle on the downhill slop affected by the winter weather conditions. Schelhaas could not move to his left because there were other vehicles passing him in the left lane. Schelhaas could not move to his right because his vehicle would have rolled over and such a move was contrary to his training. While this accident was certainly unfortunate, at most it involves nothing more than what is commonly understood to be negligence.[2]

*See* Doc. No. 31 at 7.  This is an extraordinarily sanitized rendition of the events.  When viewed in the light most favorable to Plaintiffs, the objective facts demonstrate that Defendant Staples Oil directed Defendant Schelhaas to operate a 78,000 pound tanker truck filled with flammable ethanol in hazardous weather conditions, and based on a lack of training and supervision, he operated that

---

[3] Defendants omitted the latter part of this description from their brief. *See* Doc. No. 31 at 6.

tractor-trailer at 57 mph over a blind hill on a "road [that] was icy…[and in] freezing rain, sleet, and/or hail."  *See* Doc. No. 1 at ¶ 25; Doc. No. 9 at ¶ 20; Doc. No. 34-4 at 14 (53:17-54:6); *Id.* at 15 (59:8-10); Doc. No. 35-1 at 26; Doc. No. 35-2 at 4-5.  The conditions required Defendants to operate the tractor-trailer at a crawl or cease operations altogether, but they failed to do so.  There were multiple opportunities for Defendant Schelhaas to safely exit the highway, but he failed to do so.  *See* Doc. No. 34-4 at 14 (56:7-20).  Plaintiffs contend that this conduct alone was willful and wanton, and demonstrated an extreme disregard for the rights and safety of other motorists.  *See Tranby*, 348 N.W.2d at 461; *Isaac*, 522 N.W.2d at 761.

Although the standard is an objective one, Defendant Schelhaas subjectively knew and appreciated the risks that his conduct could result in a crash and injuries to other motorists:

```
 5   Q   Do you believe that driving too fast is a major cause of
 6       crashes for commercial motor vehicles?
 7           MR. SLONEKER:   Foundation.
 8   A   They can be. yes.
 9   Q   Okay.  And again. that's something – that's not
10       something I'm making up.  That's in the CDL Manual; is
11       that right?
12   A   I believe so.
13   Q   Because in the CDL Manual we learn the principle that the
14       faster you go. the longer it takes you to stop?
15   A   Correct.
16   Q   And some of the factors that play into what makes the
17       driver able to stop would be weather conditions?
18   A   Correct.
19   Q   Road conditions?
20   A   Correct.
21   Q   How much traction you got?
22   A   Correct.
23   Q   And then how fast you're going.  All those things
24       combined for stopping issues: right?
25   A   Yes.
```

*See* Doc. No. 34-4 at 9 (35:5-25); *Id.* at 10 (38:5-11).  He appreciated that tractor-trailer wrecks can result in serious injury and/or death.  *Id.* at 8 (30:9-31:20).  Finally, he acknowledged that the FMCSR was the minimum industry standards for trucking, and he was required to comply with the FMCSR, including the provision relating to extreme caution in hazardous weather conditions.  *Id.* at 7 (25:14-18); (26:24-27:4); 10-11 (38:12-41:6).  Although he was required to slow his speed

to a crawl, he failed to do so. *Id.* at 13 (50:16-51:4). Indeed, the South Dakota Highway Patrol officer that investigated the crash issued Defendant Schelhaas a summons for driving too fast for conditions, and he did not contest the ticket. *Id.* at 16 (64:1-17).

This conscious disregard of the known hazards most assuredly amounted to "…more than mere mistake, inadvertence, or inattention," as argued by Defendants in their brief. *See* Doc. No. 31 at 7 (citing *Gabriel v. Bauman*, 847 N.W.2d 537, 543 (S.D. 2014)). Moreover, the cited case recognized that "[w]hether one acts willfully, wantonly, or recklessly is, like negligence, **normally a jury question**." *Gabriel*, 847 N.W.2d at 542 (emphasis added). Motorists in South Dakota should expect that truck drivers will not operate at grossly excessive speeds in hazardous weather conditions. South Dakota citizens should also expect that employers, the motor carriers that entrust truck drivers with 78,000 pound tractor-trailers, will properly train and adequately supervise them so that these anomalies do not occur.

Although Plaintiffs could not locate a case on point in South Dakota, a Judge in the Western District of Missouri denied a motion to dismiss a punitive damages claim when presented with similar facts. *See Ellis v. Elkins*, No. 5:18-cv-06121-NKL, 2018 WL 6331706, at *1-2 (W.D. Mo. Dec. 4, 2018). Applying a similar "conscious or reckless disregard for the safety of others" standard, the Court concluded that a violation of 49 C.F.R. § 392.14 by driving a tractor-trailer in "white-out" blizzard conditions at a speed that made it impossible to stop within his range of visibility permitted the inference that "defendants knew or should have known…that their conduct created a high degree of probability of injury." *Id.* at *2. Similarly, here, Defendant Schelhaas operated the tractor-trailer at a grossly excessive speed for the hazardous weather conditions over a blind hill that made it impossible for him to stop and avoid a collision knowing, even in normal conditions, he should have reduced his speed to anticipate hazards after cresting the hill. *See* Doc. No. 34-4 at 15 (58:11-59:10); 15-16 (60:20-61:1). Plaintiffs respectfully submit that the *Ellis*

opinion from a sister court in the Eighth Circuit is persuasive absent any authority to the contrary.

**VI.   The FMCSR Relating to Exercising Extreme Caution in Hazardous Weather Conditions is a Safety Regulation Designed to Protect the Motoring Public.[4]**

Under South Dakota law, "[t]he violation of a statute enacted to promote safety constitutes negligence *per se*." *See Engel v. Stock*, 225 N.W.2d 872, 873 (S.D. 1975); *see also Stevens v. Wood Sawmill, Inc.*, 426 N.W.2d 13, 14 (S.D. 1988) ("The violation of a statute designed for the benefit of individuals is of itself sufficient to prove a breach of duty as will sustain an action for negligence brought by a person within the protected class if other elements of negligence occur."). "The statute or ordinance becomes the standard of care of the ordinarily careful and prudent person." *Stevens*, 426 N.W.2d at 15.  As observed by a judge in this district, "the South Dakota Supreme Court has a long history of finding negligence *per se* after a person violated a traffic law." *See Delaney v. Rapid Response*, Inc., 81 F.Supp.3d 769, 774 (D. S.D. 2015) (collecting cases).

The South Dakota Supreme Court has also held that "[t]he reasons which persuaded [it] to hold that the violation of a safety statute or ordinance is negligence as a matter of law apply with equal validity to safety rules and regulations...." *See Blakey v. Boos*, 153 N.W.2d 305, 308 (S.D. 1967) (regulations adopted by the Board of Charities and Corrections); *see also Thompson v. Summers*, 567 N.W.2d 387, 394 (S.D. 1997) ("Whether [defendant] violated one or more of these statutes and [federal] regulations [relating to hot air balloon piloting and landing safety], and if so, whether the violation was the proximate cause of [plaintiff's] injuries constitutes a question for the factfinder."); *Hertz Motel v. Ross Signs*, 698 N.W.2d 532, 535 (S.D. 2005) (finding that trial court did not err in determining that a violation of a provision of the National Electric Code, adopted by

---

[4] Defendants do not raise any issue with Plaintiffs allegations that Defendant Schelhaas violated SDCL §§ 32-24-1 (Reckless Driving) and 32-26-40 (Following Too Closely).  Plaintiffs no longer intend to pursue a negligence *per se* claim on the basis of SDCL § 32-18-26, or 49 C.F.R. §§ 173, 177.816(a)(3), 393, 395 and 396.  While not proceeding on the basis of negligence *per se* on these other regulations, it remains Plaintiffs' contention that the FMCSR, CDM and industry practices prescribe the standard of care for motor carriers and truck drivers. *See* 49 C.F.R. § 392.2; *see also* Doc. No. 34-9 at 7-13.

South Dakota, could serve as the basis for negligence *per se*).

"As a general rule 'where a particular statutory **or regulatory standard** is enacted to protect persons in the plaintiff's position or to prevent the type of accident that occurred, and the plaintiff can establish his relationship to the statute, unexplained violation of that standard renders the defendant negligent as a matter of law.'" *Lovell v. Oahe Elec. Co-op.*, 382 N.W.2d 396, 397-98 (S.D. 1986) (*citing Weeks v. Prostrollo Sons, Inc.*, 169 N.W.2d 725, 728-29 (S.D. 1969)). "This is true provided the violation is the proximate cause of injury to the person for whose protection the statute or ordinance was enacted." *Id.* (citation omitted). "**Questions of proximate cause are for the jury in all but the rarest of cases.**" *Fritz v. Howard Tp.*, 570 N.W.2d 240, 244 (S.D. 1997) (emphasis added).

Defendants suggest that a violation of the FMCSR – a federal regulation – cannot provide the basis for a negligence *per se* claim because there is no analogous duty imposed by state statute or tort law. *See* Doc. No. 31 at 16 (citing *Appley Bros v. U.S.*, 924 F.Supp. 944, 961 (D. S.D. 1996)). *Appley Bros.* is inapposite since South Dakota adopted the relevant provisions of the FMCSR at issue in this action. *See* SDCL § 49-28A-3; *see also Kukla*, 310 F.3d at 1049. Indeed, the enabling statute provides, in relevant part, that "[a]ny violation of part 387 and parts 390 to 396, inclusive, the motor carrier safety requirements governing the qualifications of drivers [and] driving of motor vehicles…**is a Class 2 misdemeanor**." *Id.* Defendants feigned ignorance regarding which provision of this chapter is applicable is simply not credible, as they acknowledge this is "[t]he only potentially applicable section…." *See* Doc. No. 31 at 18. Violations of the relevant FMCSR provisions is a misdemeanor offense in South Dakota.

A federal judge sitting in the Southern District of Alabama, and construing a nearly identical enabling statute that penalized violations of the FMCSR, denied a motion to dismiss negligence *per se* claims affirming that "…violations of the FMCSR, and therefore, the Alabama

statute, constitute negligence *per se* under Alabama law." *See Woodard v. Transport Magog Express, Inc.*, No. 18-0079-JB-MU, 2019 WL 1007112, at *5 (S.D. Ala. Jan. 30, 2019) (evaluating alleged violations of 49 C.F.R. §§ 392.3, 383.111(a)(7), 383.111(a)(9), 383.111(a)(10), 383.111(a)(13) and 395.3).

As implied by its name, the very mission of the FMCSR is to promote public safety. One of the stated purposes of the Federal Motor Carrier Act of 1984 is to "promote the safe operation of commercial motor vehicles [to protect the public]." *See* 49 U.S.C. § 31131(a)(1); *see also* 49 U.S.C. § 31131(b)(1) ("[I]t is in the public interest to enhance commercial motor vehicle safety and thereby reduce highway fatalities, injuries, and property damage...."); *see also, e.g., A.D. Transp. Express, Inc. v. United States*, 290 F.3d 761, 767 (6th Cir. 2002) (observing that the purpose of the Motor Carrier Safety Improvement Act of 1999 is to "promot[e] safer operation of commercial motor vehicles").

Section 383.1 provides, in relevant part, "[t]he purpose of this part is to help reduce or prevent truck and bus accidents, fatalities, and injuries by requiring drivers to have a single commercial motor vehicle driver's license and by disqualifying drivers who operate commercial motor vehicles in an unsafe manner." *See* 49 C.F.R. § 383.1. Section 383.110 provides that "[a]ll drivers of CMVs must have the knowledge and skills necessary to operate a CMV safely as contained in this subpart." *See* 49 C.F.R. § 383.110. As noted in Section 383.111, the knowledge required includes twenty general areas, including specifically speed management and extreme driving conditions. *See* 49 C.F.R. §§ 383.111(a)(9) and (12). Similarly, the skill required includes "[t]he ability to adjust operation of the motor vehicle to prevailing weather conditions including speed selection, braking, direction changes, and following distance to maintain control...." *See* 49 C.F.R. § 383.113(c)(7).

As noted in Part 390 (General Applicability), "[w]henever...a duty is prescribed for a

driver or a prohibition imposed upon the driver, it shall be the duty of the motor carrier to require observance of such duty or prohibition." *See* 49 C.F.R. § 390.11.  Additionally, Part 392 – the section of the FMCSR dealing with Driving of Commercial Motor Vehicles – provides, in relevant part, "[e]very motor carrier…and [its] employees responsible for the…operation, or driving of commercial motor vehicles…shall be instructed in and comply with the rules in this part." *See* 49 C.F.R. § 392.1.  As noted previously, the FMCSR supersedes state law when it imposes a higher standard of care:

> "Every commercial motor vehicle must be operated in accordance with the laws, ordinances, and regulations of the jurisdiction in which it is being operated.  **However, if a regulation of the Federal Motor Carrier Safety Regulation imposes a higher standard of care than that law, ordinance or regulation, the Federal Motor Carrier Safety Administration regulation must be complied with**."

*See* 49 C.F.R. § 392.2 (emphasis added).

Part 392 includes the provision relating to exercising extreme caution in hazardous weather conditions, as referenced extensively throughout this brief:

> **§392.14 Hazardous conditions; extreme caution.**
> Extreme caution in the operation of a commercial motor vehicle shall be exercised when hazardous conditions, such as those caused by snow, ice, sleet, fog, mist, rain, dust, or smoke, adversely affect visibility or traction. Speed shall be reduced when such conditions exist. If conditions become sufficiently dangerous, the operation of the commercial motor vehicle shall be discontinued and shall not be resumed until the commercial motor vehicle can be safely operated. Whenever compliance with the foregoing provisions of this rule increases hazard to passengers, the commercial motor vehicle may be operated to the nearest point at which the safety of passengers is assured.
> [33 FR 19732, Dec. 25, 1968, as amended at 60 FR 38747, July 28, 1995]

*See* 49 C.F.R. § 392.14.

The "extreme caution" standard enunciated in this regulation trumps any lower state standard of care.  Defendant Staples Oil was under a duty and obligation to ensure that its employee understood and fully complied with this provision, yet they failed to properly train him.  Moreover,

knowing he would encounter hazardous weather conditions, they set him into motion without adequate instruction and supervision, endangering the motoring public for which this regulation was designed to protect. Defendants' claim that this statute was not enacted to promote public safety is blatantly disingenuous. *See* Doc. No. 31 at 22. Most certainly, limiting and/or prohibiting the operation of a 78,000 pound tanker truck hauling flammable liquid in hazardous weather conditions, such as the icy roadways found here, furthers the purpose of the FMCSR to promote public safety. *See, e.g., Jones v. Hirschbach Motor Lines*, 588 F.Supp.3d 953, 958 (D. S.D. 2022) (Describing argument that state statutes mandating SMV emblem, taillights, and stop lights are not safety statutes as "sophistic and [defying] both logic and common sense"). To borrow a line from this opinion, "if [this regulation was] not designed with safety in mind, then why [was it] enacted – for what purpose?" *Id.*

Defendants' reliance on state and federal cases analyzing the substantive law of other jurisdictions is misplaced. *See* Doc. No. 31 at 22-24. In *Parrick*, for example, the court observed that "…the Montana Supreme Court has repeatedly…[made] clear that in order to impute liability to a defendant as a matter of negligence *per se*…the defendant must have violated a statute, as opposed to merely an administrative regulation, safety code, or professional standard." *See Parrick v. FedEx Ground Package System, Inc.*, No. CV-09-95-M-DWM-JCL, 2010 WL 3614119, at *2 (D. Mont. Aug. 3, 2010). As illustrated above, South Dakota permits negligence *per se* for violations of regulations. *Blakey*, 153 N.W.2d at 308. Applying the substantive law of their respective forums, other federal courts have endorsed the applicability of this provision as a basis for negligence *per se*. *See, e.g., Asbury v. MNT, Inc.*, No. 12:252-KG/RHS, 2014 WL 6674475, at *9 (D. N.M. Aug. 6, 2014) (observing that expert testimony is relevant to negligence *per se* claim alleging violation of section 392.14); *Bautista v. MVT Services, LLC*, No. 16-cv-01086-NYW, 2017 WL 6054888, at *8 n.6 (D. Col. Dec. 7, 2017) (same); *Dortch v. Fowler*, No. 3:05-

CV-216-JDM, 2008 WL 834091, at *3 (W.D. Ky. Mar. 27, 2008) (contrasting 392.14 as a provision that "purport[s] to provide civil liability for prohibited conduct."); *Deela v. Annett Holdings, Inc.*, No. CIV-17-483-KEW, 2019 WL 5579539, at *1-2 (E.D. Okla. Oct. 29, 2019) (finding response to motion to dismiss identifying 392.14 as basis for negligence *per se* claim sufficient notice for failing to plead it in original petition); *Lay v. Haskins*, 549 Fed.Appx. 707, 711 (10th Cir. 2013) (finding no abuse of discretion for negligence *per se* instruction on the basis of 392.14 provided by trial court).

## CONCLUSION

WHEREFORE, Plaintiffs respectfully request that the Court deny Defendants' Motion for Partial Summary Judgment.

Respectfully submitted,

HOY TRIAL LAWYERS, PROF. L.L.C.

/s/ Scott G. Hoy
SCOTT G. HOY
901 West 10th St., Suite 300
Sioux Falls, SD 57104-3519
Ph: 605-334-8900
Fax: 605-338-1918
Email: scott@hoylaw.com

and

DANNY R. ELLIS, PRO HAC VICE
TRUCK WRECK JUSTICE, PLLC
1419 Market Street
Chattanooga, TN 37402
Ph: 423-265-2020
Fax: 423-265-2025
Email: danny@truckwreckjustice.com

**ATTORNEY FOR PLAINTIFFS ALEXANDER LEVENE AND DAVID HUSMAN**